CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 18 2025

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

SABRINA R., o/b/o S.P.,                )
A MINOR CHILD,                         )
      Plaintiff                  )   Civil Action No. 4:23-CV-32
                                      )
v.                                     )
                                      )
LELAND DUDEK, Acting                   )
Commissioner of Social Security,[1]    )   By:  Michael F. Urbanski
                                      )   Senior United States District Judge
      Defendant                  )

### ORDER

This social security disability appeal was filed by Plaintiff Sabrina R. (Sabrina), on behalf

of her minor granddaughter, S.P. The appeal was referred to the Honorable Joel C. Hoppe,

United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), for proposed findings of

fact and a recommended disposition. The magistrate judge filed a report and recommendation

(R&R) on January 31, 2025, recommending that the court affirm the Commissioner's final

decision and dismiss the case from the court's active docket. ECF No. 21. Sabrina has filed

objections to the R&R, ECF No. 22, and the Commissioner has replied, ECF No. 23. As

discussed below, the court **ADOPTS** the R&R and **AFFIRMS** the determination by the

Commissioner that S.P.'s prior disability ended on December 9, 2015, and that she had not

become disabled again as of September 27, 2023.

---

[1] Leland Dudek was named Acting Commissioner of the Social Security Administration in February 2025.
Under Rule 25(d) of the Federal Rules of Civil Procedure, he is automatically substituted as the defendant in
this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g)
of the Social Security Act, 42 U.S.C. § 405(g).

## I. Legal Standards

### A. Objections to Magistrate Judge's Report and Recommendation

The objection requirement set forth in Rule 72(b) of the Federal Rules of Civil Procedure[2] is designed to "train[ ] the attention of both the district court and the court of appeals upon only those issues that remain in dispute after the magistrate judge has made findings and recommendations." United States v. Midgette, 478 F.3d 616, 621 (4th Cir. 2007) (citing Thomas v. Arn, 474 U.S. 140, 147–48 (1985)). An objecting party must do so "with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." Id. at 622. The district court must determine de novo any portion of the magistrate judge's report and recommendation to which a proper objection has been made. "The district court may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1).

If, however, a party "'makes general or conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations,'" de novo review is not required. Diprospero v. Colvin, No. 5:13-cv-00088-FDW-DSC, 2014 WL 1669806, at *1 (W.D.N.C. Apr. 28, 2014) (quoting Howard Yellow Cabs, Inc. v. United States, 987 F. Supp. 469, 474 (W.D.N.C. 1997) and Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982)). "The district court is required to review de novo only those portions of the report to which specific objections have been made." Roach v. Gates, 417 F. App'x 313, 314 (4th

---

[2] "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b).

2

Cir. 2011) (per curiam). See also Midgette, 478 F.3d at 621 ("Section 636(b)(1) does not

countenance a form of generalized objection to cover all issues addressed by the magistrate

judge; it contemplates that a party's objection to a magistrate judge's report be specific and

particularized, as the statute directs the district court to review only 'those portions of the

report or specified proposed findings or recommendations to which objection is made.'") Such

general objections "have the same effect as a failure to object, or as a waiver of such objection."

Moon v. BWX Technologies, 742 F. Supp. 2d 827, 829 (W.D. Va. 2010), aff'd, 498 F. App'x

268 (4th Cir. 2012). See also Arn, 474 U.S. at 154 ("[T]he statute does not require the judge to

review an issue de novo if no objections are filed. . ..")

Nevertheless, as the court clarified in Elijah v. Dunbar, 66 F.4th 454, 460 (4th Cir.

2023), "objections need not be novel to be sufficiently specific."

> In Martin v. Duffy, 858 F.3d 239, 245–46 (4th Cir. 2017), this
> Court exemplified the specificity analysis by looking solely to
> whether the grounds for objection were clear. There, an objection
> which merely "restated all of [the] claims" was sufficiently
> specific because it "alerted the district court that [the litigant]
> believed the magistrate judge erred in recommending dismissal of
> those claims." Id. at 246. If the grounds for objection are clear,
> district court judges must consider them de novo, or else run
> afoul of both § 636(b)(1) and Article III.

If a litigant could not restate his argument to the district judge, in addition to "needlessly

curtailing litigants' access to an Article III judge, such a requirement could leave litigants with

no available arguments, as district court judges are not required to consider new arguments

posed in objections to the magistrate's recommendation." Id. at n.4.

In the absence of a specific, proper, and timely filed objection, a court reviews an R&R

only for "clear error" and need not give any explanation for adopting the R&R. Carr v.

Comm'r of Soc. Sec., No. 3:20-cv-00425-FDW-DSC, 2022 WL 987336, at *2 (W.D.N.C. Mar.

31, 2022) (citing Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir.

2005) and Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983)). Under those circumstances, a

court need "only satisfy itself that there is no clear error on the face of the record in order to

accept the recommendation." Diamond, 416 F.3d at 315 (quoting Fed. R. Civ. P. 72 advisory

committee's note).

### B. Standard of Review of Commissioner's Decision

Judicial review of disability cases is limited to determining whether substantial evidence

supports the Commissioner's conclusion that the plaintiff failed to meet his burden of proving

disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Laws v.

Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). In so doing, the court may neither undertake a

de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter

v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Evidence is substantial when, considering the

record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind,

Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a

directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996).

Substantial evidence is not a "large or considerable amount of evidence," Pierce v.

Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less

than a preponderance. Perales, 402 U.S. at 401; Laws, 368 F.2d at 642. "It means—and means

only—'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019) (quoting Consolidated Edison

Co. v. NLRB, 305 U.S. 197, 229 (1938)). If the Commissioner's decision is supported by

substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401. However, even under this deferential standard, a court does not "'reflexively rubber-stamp an ALJ's findings.'" Arakas v. Comm'r. Soc. Sec. Admin., 983 F.3d 83, 95 (4th Cir. 2020) (quoting Lewis v. Berryhill, 858 F.3d 858, 870 (4th Cir. 2017)). "To pass muster, ALJs must 'build an accurate and logical bridge' from the evidence to their conclusions.'" Id. (citing Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) and quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).

## II. DISCUSSION

This is a medical improvement case. S.P. is a minor, born on August 7, 2013, at 26 weeks gestational age. R. 844. At the time she was born, she weighed 730 grams. R. 847. In September 2013, Virginia Disability Determination Services found that her low birth rate functionally equaled the listing for infants with birthweights less than 1200 grams and found her to be disabled. R. 68, 90; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 100.04(A).

On December 9, 2015, it was determined that S.P no longer was disabled based on body weight and height. Her body mass index was 15.37, which did not meet or equal a listed impairment, specifically the growth failure measurements in Table III or Table IV in Listing 105.08. Because there had been a decrease in medical severity of impairments present at the time of the first disability determination, it was determined that S.P. no longer was disabled. R. 68–70, 939.

Sabrina appealed the determination that S.P. no longer was disabled, arguing that although she was no longer underweight, she had breathing problems, difficulty swallowing, speech delays, hyperactivity, temper tantrums, and distractibility. R. 89. Her application for disability benefits was denied at all administrative levels. On appeal to this district court, S.P.'s

case was remanded to the Commissioner for further consideration and she attended a second disability hearing in front of an administrative law judge (ALJ). On remand, the ALJ once again found S.P. not disabled and this appeal followed.

## A. Assessment of Childhood Disability Claims

When assessing a child's application for disability, the Social Security Administration engages in a three-step sequential evaluation, set out at 20 C.F.R. § 416.924.[3] First, the adjudicator determines if the child is engaged in substantial gainful activity. If so, the child is not disabled. If the child is not engaged in substantial gainful activity, the adjudicator next determines whether the child has an impairment or combination of impairments that is severe. If the impairment is not severe, the child is not disabled. If the child has a severe impairment, the ALJ moves on to the third step of the evaluation and reviews the claim to determine whether the child has an impairment that meets, medically equals, or functionally equals a listed impairment. If the child has such an impairment, and it meets the duration requirement, the adjudicator will find the child disabled. Id.

To find that an impairment functionally equals a listing, the adjudicator must find that the impairment results in "marked" limitation in two domains of functioning or "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The adjudicator assesses what the claimant cannot do, has difficulty doing, needs help doing, or is restricted from doing because of the impairments, assessing the interactive and cumulative effects of all the impairments, including those which are not severe. Id. When assessing functional limitations, the adjudicator looks at

---

[3] After determining that S.P.'s low birth weight no longer qualified as a disability, the ALJ followed the regular three-step process to assess Sabrina's other claims of disability on behalf of S.P. See 20 C.F.R. § 416.994a(b).

6

(1) how well the child can initiate and sustain activities, how much extra help they need, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of medications or other treatment. Id. The domains are broad areas of functioning intended to capture all of what a child can or cannot do and include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

A "marked" limitation in a domain means that a claimant's impairment interferes seriously with his ability to independently initiate, sustain, or complete activities. Day-to-day functioning may be seriously limited when impairments limit only one activity or when the interactive and cumulative effects of impairments limit several activities. A "marked" limitation also means a limitation that "is more than moderate" but "less than extreme" and is the equivalent of functioning expected to be found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. 20 C.F.R. § 416.926a(e)(2).

An "extreme" limitation in a domain means an impairment interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities. Day-to-day functioning may be very seriously limited when impairments limit only one activity or when the interactive and cumulative effects of impairments limit several activities. An "extreme" limitation also means one that is "more than marked." An "extreme" limitation does not necessarily mean a total lack or loss of ability to function and is the equivalent of functioning

7

expected to be found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3).

## B. ALJ Findings

The ALJ found that since December 15, 2015, S.P. had the following severe impairments: asthma/chronic lung disease, attention deficit hyperactivity disorder (ADHD), mood lability and disruptive behavior, and autism spectrum disorder. R. 946 (citing 20 C.F.R. § 416.924(c). In assessing the domains for S.P., the ALJ found that she had (1) a less than marked limitation in acquiring and using information, (2) a less than marked limitation in attending and completing tasks; (3) a less than marked limitation in interacting and relating with others; (4) a less than marked limitation in moving about and manipulating objects; (5) a less than marked limitation in caring for herself; and (6) a less than marked limitation in health and physical well-being. R. 947-967. Therefore, because he found S.P. had no marked or extreme limitations in a domain, the ALJ found S.P. not disabled. 20 C.F.R. § 416.926a(a).

The magistrate judge found that the ALJ's determination was supported by substantial evidence in all respects and Sabrina objects to three findings by the magistrate judge: (1) The ALJ appropriately determined that S.P. has a less than marked limitation in the domain of acquiring and using information; (2) The ALJ appropriately determined that S.P. has a less than marked limitation in attending and completing tasks; and (3) the ALJ properly considered the testimony of Sabrina and S.P. regarding S.P.'s limitations.

### (1) Domain of Acquiring and Using Information

The domain of acquiring and using information measures how well a child acquires or learns information and how well they use the information they have learned. 20 C.F.R. §

8

416.926a(g). In very general terms, children without impairments can learn to read, write, do arithmetic, and understand and use new information. 20 C.F.R. § 416.926a(g)(1)(i). "Poor grades or inconsistent academic performance are among the more obvious indicators of a limitation in this domain provided they result from a medically determinable mental or physical impairment." SSR 09-3P, 2009 WL 396025, at *3 (SSA 2009). Other indicators include the receipt of special education services, remedial or compensatory teaching methods for academic subjects, placement in a self-contained classroom, or other accommodations such as front-row seating in the classroom, more time to take tests, having tests read to the student, or after-school tutoring. Id. The lack of such indicators does not necessarily mean that a child has no limitations in this domain because some children's limitations go unnoticed and some children do not receive all the services they need. Id.

The ALJ assessed S.P. as having a less than marked limitation in the domain of acquiring and using information. R. 951-54. In reaching this conclusion, the ALJ cited to the following evidence:

(1) October 2015 testing revealed below average or delayed scores on the developmental profile (R. 384);

(2) in a November 2015 individualized education plan (IEP), it was noted that S.P. had mild delays in receptive language and moderate delays in expressive language skills and was below average in many developmental areas, including pre-academic, adaptive, and social skills (R. 201-223);

(3) by reporting period four, S.P. was making significant gains in receptive and expressive language skills since starting pre-school and was described as very social (R. 244–249);

(4) in December 2015 it was noted that S.P. had developmental delays and underwent physical and occupational therapy and she had fewer spoken words in her vocabulary than other children her age although she could name some familiar objects and point to some named pictures or name pictures in a book (R. 538);

9

(5) in January 2016 S.P. continued with some developmental delays, but when she returned in January 2017 the provider did not observe any developmental delays (R. 548-553, 567–572);

(6) in February 2017 S.P. was doing well and mainstreamed into the regular classroom; her auditory comprehension, expressive communication, and total language scores fell into the average range (R. 363, 375);

(7) in May 2018 testing showed that S.P. no longer qualified for special education classes as her skills and scores on the Stanford Binet V test fell within the average range or higher; she had made excellent progress with her ability described as "average" and her pre-academic skills as being "on target" (R. 340–352);

(8) S.P. entered kindergarten in 2018 and in 2019 was noted as making progress academically but being somewhat behind in maturity and was advised to work on reading over the summer (R. 841, 1392);

(9) at Sabrina's request, S.P. was seen in November 2019 to discuss an IEP, where the case manager noted that the main issues in school were defiant behaviors, not complying with instructions and directions, and sleeping in class, with no academic issues reported and with the further note that when S.P. was awake, she was smart and doing her work (R. 1603);

(10) in December 2019 S.P. continued in to be in a regular classroom without any special accommodations (R. 1610);

(11) academic testing in 2020 showed that S.P. had average cognitive functioning and achievement scores mostly in the average to above-average range with a relative weakness on the mathematics subtest which was not low enough to be consistent with a learning disability; additional educational assistance was not recommended (R. 1643, 1665);

(12) in November 2021 it was reported that S.P.'s report card was average although she refused to do her work at school and had been sent to the office a few times (R. 1379–1386);

(13) in January 2022 Sabrina reported that S.P. was doing well in school and making As and Bs on her report card (R. 1452);

(14) after a medication change in March 2022, Sabrina reported that S.P.'s grades dropped to Cs and Ds (R. 1458);

(15) in March 2022 testing showed S.P.'s reading and mathematics skills were average and her written expression was somewhat of a problem, although she made the honor roll the first semester (R. 2104, 2117);

(16) in May 2022 S.P. was recommended for summer school although she made the honor roll that year (R. 1369-1374);

(17) S.P. did not pass the 2021–2022 standards of learning assessment in mathematics or reading although another test in 2022 indicated she was reading on a third-grade level (R. 1205–1206, 1207);

(18) in November 2022 Sabrina reported that S.P. was doing well in school overall with math still being a bit of a problem but better than it had been; S.P. had received some progress reports and was on the principal's list (R. 1358–1363);

(19) in February 2023, S.P.'s fourth grade teacher reported that she had a slight to serious problem in acquiring and using information, struggled with fourth-grade content, had challenges with reading comprehension and reading difficult words, and struggled with math skills as well as with completing work independently (R. 1249–1256).

After the ALJ provided the above summary of the evidence, she concluded the following:

> The Medical records indicate that the claimant's below average and delayed development that was noted in 2015 improved with special education services, and that she was later found ineligible for special education services, with average intellectual functioning scores. While she had some academic challenges, she does not have a learning disability and she has not qualified for an IEP or a 504 plan since entering elementary school. The claimant was found ineligible for special education services in May 2018, and when the claimant began receiving case management services in September 2019, when she was in first grade, the claimant's grandmother reported that once she started at her current elementary school, she no longer had an IEP. … Overall, the record does not support [sic] that the claimant has some limitations in this domain, but they are less than marked.

R. 954.

The magistrate judge found that the ALJ examined all the relevant evidence and offered a sufficient rationale for crediting certain evidence and discrediting other evidence. R&R, ECF No. 21 at 23 (citing Shelly C. v. Comm'r of Soc. Sec. Admin., 61 F.4th 341, 353 (4th Cir. 2023)). In particular, the ALJ looked at Sabrina's testimony and the medical and non-medical opinions, rejected the state agency experts' determinations that S.P. had no limitation in either

domain, summarized the material portions of the medical and educational records, and adequately explained how she arrived at her conclusion that Sabrina's limitations did not rise to the level of "marked" in either the domain of acquiring and using information or attending and completing tasks.

Sabrina argues that the magistrate judge erred when he concluded that the ALJ's determination that S.P. had a less than marked limitation in acquiring and using information was supported by substantial evidence. Sabrina asserts that although the ALJ summarized the evidence in the record, she did not explain how the evidence supported her determination.

It is well-established that a reviewing court "must uphold the Commissioner's decision 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" Rogers v. Kijakazi, 62 F.4th 872, 875 (4th Cir. 2023) (quoting Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 267 (4th Cir. 2017)). If the ALJ identifies the evidence relied upon and "'build[s] an accurate and logical bridge from the evidence to [the] conclusion,'" the court should affirm the decision. Ladda v. Berryhill, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting Monroe, 826 F.3d at 189). The court must not be left to guess about how the ALJ reached the determination. Mascio v. Colvin, 780 F.3d 632, 637 (4th Cir. 2015).

The ALJ fulfilled her duty to adequately explain her decision in this case. She explained that while the medical records indicated that S.P.'s development was delayed and below average in 2015 when she was two years old, she made progress with special education services, and later was found ineligible for special education services, based on scores showing average intellectual functioning. Although she continued to have some academic challenges, she was not diagnosed with a learning disability and did not qualify for an IEP or a 504 plan since

12

entering elementary school. The ALJ concluded that overall, while the record showed that S.P. had some limitations in this domain, they were less than "marked." Because the court is not left to guess at how the ALJ arrived at her conclusion, it concludes that the ALJ's opinion is supported by substantial evidence. Accordingly, S.P.'s objection to the magistrate judge's conclusion on this issue is **OVERRULED**.

### (2) Attending and Completing Tasks

The domain of attending and completing tasks looks at how well a child can focus and maintain attention and how well they begin, carry through, and finish activities, including the pace at which they perform activities and the ease with which they change activities. 20 C.F.R. § 416.9262(h). Examples of limited functioning in this domain include being easily startled or distracted, being slow to focus or fail to complete activities of interest to the child, repeatedly becoming sidetracked form activities or frequently interrupting others, becoming easily frustrated and giving up on tasks, and requiring extra supervision to stay engaged. 20 C.F.R. § 416.9262(h)(3).

The ALJ assessed S.P. as having a less than marked limitation in the domain of attending and completing tasks. R. 954–960. In reaching this conclusion, the ALJ cited to the following evidence in the record:

(1) S.P. was diagnosed with ADHD in September 2017 and prescribed medication (R. 804);

(2) in April 2018 S.P. was described as quite tired during the day and had difficulty falling asleep at night, with medication tending to calm her down so she could participate in class; on examination her thought process was described as logical, tangential at times with associations intact, and her attention and concentration were impaired but improved with effort (R. 830–31);

(3) in September 2018 Sabrina reported that medication helped in that S.P. was not feeling tired during the day but was quite fidgety and restless and needed to be redirected somewhat;

13

on exam S.P.'s thought process was logical but tangential at times with associations intact and her concentration was impaired but improved with effort (R. 827–28);

(4) in November 2018 Sabrina reported that new medication was working well and that S.P. was sleeping better and her teacher reported that she could be redirected easily (R. 834);

(5) in March 2019 Sabrina advised that S.P.'s kindergarten teacher said she might not move to first grade if she could not learn to follow the rules and stay in her seat and in May 2019 S.P.'s teacher advised that she should work on classroom behaviors over the summer to prepare for the next grade because she had struggled with hyperactivity and oppositional behaviors (R. 841, 1392);

(6) in September 2019 S.P. started case management treatment including in-school observation and individual counseling; Sabrina reported that S.P. had been rolling around on the floor at school and refusing to do her schoolwork and on exam S.P. was described as distracted and impulsive with tangential thought processes (R. 1531–1540);

(7) in September 2019 Sabrina reported she was receiving daily calls from the school that S.P. would not stay in her seat and could not focus or do her work; in October 2019 S.P. reported slight improvements with medication changes although S.P. was falling asleep at school; S.P. was noticeably less fidgety and hyperactive in an appointment (R. 1398, 1401, 1404);

(8) in November 2019 S.P. was observed sleeping in class and crawling around on the floor; Sabrina reported that S.P. was having worse behavior at school; following a sleep study, S.P.'s poor sleep was attributed to poor sleep hygiene (R. 1569, 1576, 1505);

(9) around the same time it was reported that S.P. had physically refused to get on a bus for a field trip, had purposefully urinated in class to get out of the classroom, was getting up at night to use electronic devices to watch videos or play games, was sleeping during the day, was smart and did her work when awake, but defiant when she had to be woken up, was distracted and had difficulty focusing, was observed crawling around on the floor, had a bowel movement while in class but did not tell the teacher, needed to be redirected multiple times to focus on schoolwork, and was often behind on schoolwork (R. 1595–1604);

(10) in December 2019 Sabrina reported that she advocated for an IEP or behavior plan and in the past two weeks S.P.'s behavior had improved and she was sleeping better; in January 2020 Sabrina reported that the school was allowing S.P. to sleep during the day; S.P. was observed to crawl around on the floor and underneath the chairs, but also was able to converse and answer questions and maintain eye contact (R. 1407, 1410);

(11) testing in February 2020 showed no major problems with attention, concentration, hyperactivity, or impulsivity; S.P.'s case manager noted that S.P.'s primary care provider and lung specialist attributed the daytime sleepiness to poor sleep hygiene, including Sabrina allowing her to nap too long after school, having no structured bedtime, and allowing her to

14

watch television when she woke up at night and could not sleep; a sleep study showed S.P. having 6.8 percent REM sleep compared to a normal 25 percent REM sleep for children her age (R. 1643, 1652);

(12) at a visit to a lung specialist in March 2020 S.P. was noted to be very active and easily distracted and Sabrina reported that her ADHD was out of control at school (R. 1333, 1334);

(13) during the COVID-19 pandemic S.P. participated in online school where she completed more of her work and caught up with her assignments although she was fidgety during the day; Sabrina noted improvement after a medication adjustment; at an appointment S.P. was noted to talk, maintain eye contact, and answer questions, but would not follow directions (R. 1419, 1422, 1425);

(14) from February 2021 through June 2021 S.P. was described as being quite hyperactive and displaying symptoms of ADHD even with increased medications and was seen crawling on the floor but responding to questions; Sabrina had to sit with her to complete an evaluation at school and she had difficulty focusing and staying on task; a medication change helped with focus and S.P. was able to answer questions more appropriately with clearer thought processes though she was still hyperactive; she was better able to follow directions and sit and complete schoolwork, was able to complete up to four-step directions, could stay focused during her baseball games; testing showed that she had difficulty sustaining attention to tasks or activities and was easily distracted by extraneous stimuli (R. 1428, 1431,1434, 1440, 1437, 1930, 1934–35, 2766);

(15) in July 2021, S.P. had been doing well with medication, her energy was manageable, and she had done very well in four weeks of summer school, following instructions and staying engaged (R. 1443);

(16) when S.P. returned to school in the fall she did quite well while still receiving some one-on-one assistance, had better focus, and her teacher had not observed her sleeping frequently or playing on the floor (R. 1449);

(17) in November 2021 Sabrina reported that S.P. was doing fairly well at school and although she was fidgety during the appointment, the case manager noted that S.P. was more focused, and was listening, following directions, and making her best effort (R. 1449, 2046);

(18) in January 2022 Sabrina reported that S.P. was still fidgety at times but was better and was communicating better (R. 1452);

(19) in February 2022 S.P.'s case manager reported that S.P.'s teacher said that she could tell when S.P. had stayed up late for a family function because she would return to her past behaviors of sleeping, refusing to complete work, and being defiant (R. 2094);

(20) in March 2022 it was reported that S.P. was struggling with hyperactivity which was causing some disruption in class, falling behind in some of her work and trying to catch up at home where she found it difficult to sit still; at the visit with her case manager she was jumping on the couch and having a hard time paying attention and answering questions; an assessment showed S.P. very often had difficulty sustaining attention to tasks or activities, was easily distracted, would run about or climb excessively, disrupted class, had somewhat of a problem completing assignments, and had an average ability to follow directions and stay organized (R. 1455, 1458, 2104);

(21) a quarterly review in March 2022 noted that for the most part S.P. was not falling asleep or crawling on the floor like she did in first grade or using baby talk; she was described as being quiet and able to listen and follow directions (R. 2117);

(22) in May 2022, after a medication change, Sabrina reported noticeable improvement in S.P.'s behavior and in June 2022 she was sleeping better and did well in a summer program, working on each subject, completing work, concentrating, and not being distracted (R. 1464, 2162);

(23) in August 2022 S.P.'s concentration and focus remained adequate and in September 2022 her sleeping habits had improved and she was not falling asleep on a consistent basis; she was following directions and focusing on instruction in school (R. 1467, 2213);

(24) in October 2022 an assessment showed that S.P. was often easily distracted and fidgety, her ability to follow directions was average, and assignment completion and organizational skills were somewhat of a problem (R. 2232);

(25) in November 2022 S.P.'s teacher reported that she was trying to do her best to complete her schoolwork without distraction and less redirection and the use of earplugs had been helpful (R. 2243);

(26) in early 2023, Sabrina reported that S.P.'s focus and concentration remained adequate but she struggled at times, especially with completing assignments; S.P. reported staying up very late talking on her phone, watching videos, or playing games without Sabrina's knowledge; while she had not fallen asleep much in class, she had fallen asleep when the class was on the carpet or mat (R. 1470-72, 2848, 2854);

(27) in April 2023, S.P. continued to present as somewhat improved and was making fairly good progress in school although she had some trouble focusing and completing work in a timely manner; she was not defiant or refusing to do work and her behaviors in the academic setting were reasonably appropriate (R. 2856);

(28) S.P.'s fourth-grade teacher reported that she had a very serious problem working at a reasonable pace/finishing on time, a serious problem organizing and completing work accurately and no problem to an obvious problem attending and completing tasks; the teacher gave her a modified amount of work to complete because it took S.P. a long time to complete

assignments; when S.P. was taking ADHD medication she was focused and able to remain on task (R. 1249–1256).

After providing this detailed summary, the ALJ concluded the following:

> Overall, the claimant's behavior in the classroom and ability to focus is impacted by her ADHD, but it is also impacted by her poor sleep habits and sleep hygiene. The record indicates that her case manager and school administrators, as well as the claimant's medical providers, advised the claimant's grandmother that the claimant's sleep impacted her school behavior and that sleep was the claimant's primary issue. In fact, the claimant's grandmother herself attributed the claimant's behavior to poor sleep at one point. The claimant's teacher even reported that she noticed when the claimant had less sleep. Adjustments in medications would improve the claimant's symptoms at times, as well, and the claimant did have periods of time with adequate and improved focus and concentration. While the claimant does have some limitations in this area related to her impairments, with medication and proper sleep habits, they are less than marked.

R. 960.

The magistrate judge found that the ALJ examined all the relevant evidence and explained with citation to the record the reasons for her finding that S.P. had a less than marked limitation in the domain of attending and completing tasks.

Sabrina objects that contrary to the findings of the ALJ, the evidence of record documents that while medication improved S.P.'s sleep, her deficits in concentrating, focusing, and completing tasks did not improve and that the ALJ failed to acknowledge that any improvement in S.P.'s ability to concentrate, focus, and complete tasks was short-lived and that her medications needed to be adjusted continually. Objs., ECF. No. 22 at 3–4. First, it is not accurate to say that medication did not improve S.P.'s ability to concentrate, focus, and complete tasks. See, e.g., R. 834 ("Grandma states that the increase in Strattera appears to be working well and her teacher states that she is able to be redirected easily and is learning and

17

engaging in group activities in an age-appropriate manner."); R. 1401 ("Grandma states that she feels there has been some slight improvement with the addition of the Intuniv and [S.P.] is noticeably less fidgety and hyperactive in the appointment today however is quite sleepy as well."); R. 1425 ("Grandma states that [after medication changes] [S.P.] is slightly more focused and able to be redirected but still quite hyperactive."); R. 1437 ("Grandma reports that [after medication change] [S.P] had improved some with her focus and completion of assignments. She states that she is not as distracted and is definitely eating better.").

In addition, with this argument Sabrina is asking the court to reweigh the evidence, which it cannot do. The ALJ noted instances where S.P. had difficulties with concentrating, focusing, and completing tasks (R. 830–31, 827–28, 841, 1392, 1531–1540, 1398, 1401, 1569, 1576, 1595–1604, 1410, 1333–1334, 1428, 1431, 1434, 1934–35, 1455, 1458, 2104, 2232, 1249–1256) and other instances where S.P. was described as doing well in these areas (R. 834, 1404, 1643, 1652, 1419, 1422, 1425, 1407, 1440, 1437, 1443, 1449, 1452, 2046, 2117, 2766, 1464, 2162, 1467, 2213, 2243, 2586). It is the duty of the ALJ and not the courts to weigh the evidence and resolve conflicts. Aistrop v. Barnhart, 36 F. App'x 145, 146 (4th Cir. 2002) (citing Hays v. Barnhart, 907 F.2d 1454, 1456 (4th Cir. 1990)). The ALJ has thoroughly reviewed the record and explained her resolution of the conflicts in the evidence--that S.P.'s limitations are less than marked when she has proper sleep and is using her medication--and the court does not have authority to second-guess her analysis.

Sabrina further objects that the ALJ did not properly assess the opinion of S.P.'s fourth grade teacher. Objs., ECF No. 22 at 4. The ALJ summarized the teacher's evaluation of S.P. where the teacher commented that S.P. was focused and able to remain on task when taking

ADHD medication. R. 959 (referring to R. 1450–1456). In assessing the domain of attending and completing tasks, the ALJ found that S.P.'s behavior in the classroom and ability to focus were impacted by her ADHD but also by her poor sleep habits and sleep hygiene. She also found, consistent with the teacher's assessment, that adjustments in medication would improve S.P.'s symptoms at times and that she had periods of time with adequate and improved focus and concentration. R. 960. This assessment is sufficient because the court is not left to guess how the ALJ determined the amount of weight he gave to the teacher's opinion.

Finally, Sabrina objects that the ALJ improperly found that Sabrina's sleep issues, rather than her ADHD, were the driving force behind her impairments. Objs., ECF No. 22 at 5–6. She claims that the ALJ focused on S.P.'s sleep issues and "cherry-picked" evidence to support her conclusion that it was the sleep issues, rather than the ADHD, that caused her limitations. See Arakas, 983 F.3d at 98 (quoting Lewis v. Berryhill, 858 F.3d 858, 869 and Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010)) (noting that while the ALJ is not required to cite to all the evidence in the record, he "has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.")

However, as set forth above, the ALJ attributed S.P.'s difficulties to both her ADHD and to her poor sleep habits. R. 960. Regarding her sleep habits, the ALJ cited to reports from her primary care provider and pediatric lung specialist that S.P.'s lack of sleep and sleep hygiene caused her excessive daytime sleepiness and in particular S.P. sleeping on the bus to and from school, napping too long after school, having no structured bedtime, and Sabrina allowing S.P.

to watch television in the middle of the night when she woke up and could not get back to sleep. R. 956, 1652. The ALJ also noted that S.P.'s third grade teacher reported that she could tell when S.P. had stayed up too late for a family function because she would return to her past habits of sleeping during class, refusing to complete work, and being defiant. R. 957, 2094. The ALJ also cited to S.P.'s own report in the spring of her fourth-grade year that she would stay up late using electronic devices without Sabrina's knowledge and that she sometimes fell asleep on the carpet in the classroom. R. 958, 2854.

The ALJ also cited to other non-sleep-related evidence in the record, including comments that S.P. would not advance to first grade if she could not learn to follow the rules and stay in her seat and that she was advised to work on classroom behaviors over the summer because she struggled with ADHD and oppositional behaviors. R. 841, 1392. The ALJ also reported several observations of S.P. rolling around on the floor and refusing to do schoolwork or cooperate at a medical visit, R. 1531–1540, 1576, 1410, that she was distracted and had difficulty focusing, R. 1597, and that she was very active and easily distracted. R. 1334. The ALJ cited to reports that S.P. was quite hyperactive and displaying symptoms of ADHD even with increased medication, that she was struggling with hyperactivity, that her teachers were complaining about S.P.'s inability to sit still, pay attention, and complete her work, and that she was easily distracted by external stimuli. R. 1428, 1455, 2104.

A reading of the record does not indicate that the ALJ "cherry-picked" evidence, but rather cited to the wide variety of reports in the record before concluding that while S.P. had some limitations related to her impairments in the domain of attending and completing tasks, with medication and proper sleep habits, her impairments were less than marked. R. 960.

Sabrina argues that the ALJ mischaracterized the evidence to fit her narrative, but the record does not support that allegation. As the ALJ acknowledged, there is evidence in the record showing that ADHD symptoms cause problems for S.P. at home and in the classroom and evidence in the record showing that poor sleep habits and hygiene cause the problems. It is the province of the ALJ to weigh the evidence and make a determination and she has done so in this case.

In sum, the court finds that the ALJ adequately explained her reason for finding that S.P. had a less than marked limitation in the domains of acquiring and using information and attending and completing tasks. Accordingly, Sabrina's objections are **OVERRULED**.

### III. Conclusion

For the reasons stated, the court **ADOPTS** the R&R, ECF No. 21, **OVERRULES** Sabrina's objections, and **AFFIRMS** the determination of non-disability made by the Commissioner. This case is **DISMISSED** and **STRICKEN** from the active docket of the court.

It is so **ORDERED**.

Entered: *March 13 2025*

Michael F. Urbanski
Senior United States District Judge